## ROBERT FERGUS *et al.*

### *v.*

## JAMES H. WOODWORTH *et al.*

1. HOMESTEAD—*mortgagor.* To entitle a mortgagor to a homestead in the mortgaged premises, such mortgagor must not only be the head of a family, but, at the time of mortgaging, therewith reside and so continue to reside on the mortgaged premises.

2. SALE—*judicial—where impeachable for being en masse.* A sale of property by a judicial officer ought not to be set aside, except for such irregularities as manifestly produce injustice and wrong. If, however, a sale of property in gross produces such inadequacy of price as to amount to a great wrong and oppression, a court of equity might entertain jurisdiction, even two or three years after the sale, and afford relief against the purchaser if he had not parted with the title, upon reasonable excuse being shown for the delay.

3. PURCHASER—*decree—effect of reversal.* If a judgment or decree be reversed for error after sale of property thereunder, it is a settled principle of the common law coeval with its existence, that the defendant shall have restitution of the purchase money, and the purchaser shall hold the property sold, *except* where the plaintiff in the judgment or decree becomes purchaser and still holds the title.

4. SAME—*notice lis pendens.* The rule of notice *lis pendens* does not apply to a purchaser under a decree of foreclosure who is not a party to the record. The law does not require such purchaser to inspect the record, and to see that it is free from errors. He only has to see that the court has jurisdiction, and there is such a judgment or decree, unreversed, as authorizes the sale.

APPEAL from the Superior Court of Chicago; the Hon. JOHN M. WILSON, Chief Justice, presiding.

On the 13th day of December, 1859, Robert Fergus, being the owner of sub-lot one (1), and the north twenty-five (25) feet of sub-lot two (2) of the subdivision of original lot six (6), in block three (3), in the fractional section fifteen (15), addition to Chicago, being sixty-five (65) feet fronting on State street, between Monroe and Adams streets, and one hundred and twenty-four feet in depth to the alley in rear, according to the plats of the same duly recorded in Cook county registry, including the three brick stores and other buildings standing and being thereon, executed a mortgage thereon, in which his wife, Margaret Fergus, joined, to secure the payment of $13,000 to David Sears, Jr.

Said Sears assigned the mortgage to Edward I. Tinkham, who, upon default, foreclosed in the Superior Court of Chicago, and the master in chancery, under the decree of the court, sold the premises to Woodworth, who became the purchaser thereof under an agreement between him, P. W. F. Peck and E. I. Tinkham. After the time for redemption had elapsed, the master conveyed the premises to Woodworth by master's deed.

Woodworth caused a writ of assistance to be placed in the hands of Hammond, then sheriff of Cook county, Johnston having in the mean time bargained with Woodworth for said premises.

Robert and Margaret Fergus then filed a bill against Woodworth and Hammond, and restrained them from taking possession of a part of the mortgaged premises claimed as their homestead.

Woodworth answered this bill, denying the claim of homestead, and filed a cross-bill praying that the premises be decreed to be free from the homestead claim, and that possession thereof be surrendered to him.

Fergus and wife then sued out a writ of error upon the decree of foreclosure, upon the ground that interest had been compounded, and at the April Term, 1865, of this court, the decree was reversed, upon the ground that the decree was for about sixty dollars more than was alleged to be due in the bill for foreclosure.

After the reversal of the decree of foreclosure, Fergus and wife filed a supplemental bill, setting up the reversal of the decree of foreclosure, under which Woodworth derived title, and alleging that Woodworth's purchase was not *bona fide*, and stating that the master had improperly sold the premises *en masse*, when he should have sold them in parcels.

Woodworth denied that his purchase was not *bona fide*, and insisted that the master in chancery made sale of the premises in a proper manner.

Messrs. HERVEY, ANTHONY & GALT, for the appellants.

Mr. P. L. SHERMAN, for the appellees.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court:

The first question presented by the record is, whether appellants, Fergus and wife, have homestead rights in the premises in controversy. The mortgage to Sears was not given to secure purchase money, or indebtedness incurred in the improvement of the property, and was executed after the homestead law and amendatory act were passed. The question is thus free from all considerations but that of residence. Fergus was at the time the head of a family and residing with the same, but it is not pretended that they or their family were on these premises. On the contrary, they, with their family, were residing in another house, owned by them, on a different street in the city, and they did not return to reside on this property until some time after the foreclosure and sale under the mortgage. And it also appears, that, when the mortgage was given, the several portions of the house were occupied by different tenants, and so continued until after the sale was made by the master.

The building consisted of a block extending the length of the front of the lot, and was about sixty-six feet. The building was three stories high, and was divided by partition walls into three parts. The lower story was occupied as stores, and

the upper stories were used for dwellings. After the spring of 1860, appellant Fergus occupied the north store room as a printing office. This excludes every supposition that this property was in fact the residence of Fergus and family, whatever may have been his intention when he left. it, or during the time he resided on Quincy street.

The fact, that he previously occupied and resided on this property, as a home, could not give it the character of a home, after removing, not only his family, but the house in which they had lived, from the premises to a different part of the city and occupying it as a dwelling, for himself and family, for several years. It is true, that a portion of the family testify, that, while erecting the building on these premises, he and his wife spoke of planning the upper stories of the northern part of the house for a residence for himself and family. But he resided on Quincy street from some time in 1858 or 1859 until the early part of 1862, when he returned with his family, and resided in the upper stories of the northern part of the building until the trial below. So that, if it was his design to make this his home at the time he was erecting the block, he delayed its execution for three or four years, if it was not abandoned at the time of its completion.

We are not prepared to hold, that the head of a family may abandon the lot of ground, remove his dwelling to other premises, remove his family to the latter place, incumber the premises on which he formerly resided, and, after an absence of three or four years, return to his former home, and claim and hold it as a homestead against such an incumbrance, merely by showing that it had been his home, and that he had during his abandonment of the property as a residence, a secret intention at some time in the future to resume it as a home. It cannot be pretended that Fergus apprised Sears at the time the mortgage was given, that he claimed homestead rights in the property, nor is it so stated in the mortgage. There is nothing appearing in the record which in the least was calculated to apprise Sears, or those claiming under the mortgage, that there was any pretense that it was held, or even intended to be held, as a

homestead by the mortgagors. While such notice may not be necessary in all cases to entitle a party to assert the right, it would be inequitable and productive of great injustice to permit a mere secret intention, without any thing to put creditors and purchasers upon inquiry at least, to control in the stead of a residence upon the premises, and to enable the mortgagor to enforce the right under the statute. On the contrary, every thing connected with these premises was calculated to produce conviction, that the property had been permanently abandoned as a home. It was occupied by tenants for business purposes, and as dwellings, and the mortgagor was residing with his family in other property as a home. We are, for these reasons, of the opinion that Fergus and wife had abandoned these premises as a residence at the time they executed the mortgage, and that they then or since that time have had no right to claim it as a homestead against this mortgage. To permit its assertion, under such circumstances, would lead to the perversion of the law into an engine of fraud and wrong, that could never have been designed by the general assembly when it was adopted.

It is likewise insisted, that, as the property was sold by the master *en masse*, the court below erred in not setting aside the sale. Appellants, Fergus and wife, were defendants to the bill for a foreclosure, were duly served with process, were properly in court, and must, therefore, be presumed to have been fully informed of every step that was taken in the progress of the case. They must have known of the sale and the manner in which it was made. A report was made by the master of the sale and how it had been conducted, and it was approved by the court without objection. They filed no objection to the report, nor did they in any manner oppose the approval of the sale on the master's report. If mere irregularities existed, they should have appeared and insisted upon them to prevent the approval of the sale, and moved at the coming in of the master's report, or at least within a reasonable time, to have the sale set aside and to have the property again offered. While a court of equity would not apply it as an inflexible rule, that such a motion should be interposed, on the coming

in of the report, at the next term after the sale, still, if not then made, or at least before the time for a redemption has expired, the court would not set aside the sale for trifling objections, or mere informalities, or because property susceptible of division had been sold *en masse,* unless it appeared that real injustice and wrong had resulted. After the time for redemption has expired and his equity is barred, the mortgagor should not be heard to impeach the sale, except by showing that there was fraud or oppression, and that substantial injury had resulted, and even then, it might be necessary to afford a reasonable excuse for having delayed such a length of time before asserting his rights. A party should not be permitted to remain inactive until long after the sale, and then, if to his interest, avoid it, or, if not, permit the purchaser to hold the property. It is highly desirable that there should be some degree of stability given to judicial sales. They should not be set aside except for such irregularities as manifestly produce injustice and wrong. In this case the parties have slept upon their rights, and have been guilty of such *laches* as must prevent them from having this sale set aside, simply by showing that the property could have been divided, and might have by that means brought more than it did. They have delayed too long in the assertion of the right, and must be considered as having waived it.

If, however, the sale of property in gross produces such inadequacy in the price as to amount to great wrong and oppression, a court of equity might entertain jurisdiction even two or three years after the sale, and afford relief against the purchaser, if he had not parted with the title, upon a reasonable excuse being shown for the delay. It is insisted, that the price of the property was greatly depressed by the sale being *en masse,* and a large amount of evidence was taken to establish and to rebut the presumption that such was the fact. And in this, as in most cases involving the value of property, and especially so when it is to ascertain its value several years previous to the time of the inquiry, there is great diversity of opinion. Some of the witnesses fix its value at the time it was

sold at double the amount at which it was struck off to the purchaser, while others say it sold for all it was then worth, and opinions vary between these points, and scarcely any two fully agree, concurring on any one price.

It is apparent, that property at the time this sale was made was depressed, and quite unsalable. It appears that Fergus offered the property in the early part of 1863, to Otis, for $21,000. This then clearly shows, that he did not regard the property as worth double the sum for which it was sold. And, if he considered the price grossly inadequate, it is strange that he did not move to have the sale set aside for that reason. This is a significant fact in reference to the value. And another equally important is, that we find he was in the market offering it for sale before the redemption expired, and, if so grossly inadequate, it is strange that he did not effect a sale, redeem the property, and save a large surplus; or that he could not raise on the property by a loan a sum sufficient to redeem, and thus preserve it from sacrifice.

Again, the proof shows, that other property, situated near to this, was sold about the same time at private sale, at but slightly higher rates. While witnesses give the opinion, that the property was sacrificed at the sale, we must believe that they do not distinguish with sufficient accuracy between present values and those of that period. Property has been constantly advancing in value since that period; and the price bid, as compared with the present value of this property, would no doubt show great disparity; but the sale must be tried by values then existing, and not by present prices. From all the evidence in this record, we are unable to say that the bid was so small that the sale should be set aside, or that it operated as a fraud on appellants' rights, or was oppressive. If injury resulted from the smallness of the bid, it is perhaps no greater than usually occurs in sales of this magnitude. We should not feel warranted in vacating this sale after the delay that has occurred, on the evidence in this record, either on account of the smallness of the price bid, or because the property was not divided and sold in separate parcels.

We now come to the question whether appellee Woodworth was affected by the reversal of the decree of the court, under which he purchased. It has been said, if a judgment or decree is reversed for error, it is a settled principle of the common law, coeval with its existence, that the defendant shall have restitution of the purchase money, and the purchaser shall hold the property sold. 10 Peters, 473. To this rule there may be an exception, and it is where the plaintiff in the judgment or decree has became the purchaser, and still holds the title under his purchase. In this case Woodworth was not the complainant, nor was he even a party to the record in which the decree was rendered. He does not therefore fall within the exception, unless his connection with the case shall produce the same result as if he had been a complainant. His interest was acquired subsequently to the rendition of the decree, and he in fact bid off the property in his own name, and obtained the master's deed after the time for redemption had expired.

It is, however, urged that he either purchased as the assignee of the decree in his own right, or as Peck's agent, who was the beneficial owner of the mortgage at the date of the decree. That Peck thereby became chargeable with notice of the errors in the decree, under which the sale was made. We do not understand that the rule of notice of *lis pendens* applies to a purchaser not a party to the record. Before the sale is made the suit is terminated, the controversy is ended, and the rights of the parties to the record are fixed. The claim has ripened into a judgment or decree, and it must be presumed that all defenses have been made and judicially passed upon and determined, and that nothing remains but for the plaintiff to have the fruit of his judgment or decree — to have execution. Woodworth was not, then, a purchaser chargeable with notice *lis pendens*, and the rules applicable to such notice cannot affect his rights. That notice only applies to charge a purchaser with all of the defenses involved in the litigation, so that he shall be bound by the determination of the matter in controversy, and will not be heard to insist upon defenses or grounds of recovery that might have been presented. He

takes the place of the party of whom he purchases, and is bound by the decree to which his vendor was a party.

At the time the decree of foreclosure was rendered, Peck did not own the mortgage, but he simply held it as collateral security for a debt which Tinkham owed him. That he might still retain it as a security, and have the control of it, after it was reduced to a decree, it was agreed that the mortgage should be foreclosed in his name; but, from some cause not very clearly appearing, the foreclosure was had in the name of Tinkham. So that Peck was not a party to the record; but, after Peck learned how the decree had been rendered, he took the necessary steps to have it transferred to him as a security for his debt against Tinkham. And the evidence shows that Woodworth agreed with Peck to bid it off in his name, and to pay him the amount of his claim on Tinkham, and to secure which he held the decree of foreclosure. After paying that sum, Woodworth was to hold the decree, or its avails, to secure the refunding of the amount he should advance to Peck, and the balance to secure a debt which he held against Tinkham, in favor of the insurance company. By this arrangement, with Tinkham's assent, Peck held a first lien on that decree, to secure the payment of about $10,000, and Woodworth a second lien, to secure a debt of several thousand dollars owing by Tinkham. At the sale, however, Woodworth purchased the property, and received a certificate of purchase from the master in his own name. Subsequently, he assigned the certificate of purchase to Peck, when an agreement was drawn up and executed by the parties, declaring their rights under this purchase, as it had been previously understood. It declared that Peck should hold the certificate until his debt should be paid, which Woodworth undertook to do, and then it was to become Woodworth's, and the balance of the purchase money over and above the payment to Peck was to be applied on the debt which Tinkham owed to the insurance company.

Woodward was only induced to become the purchaser as a means of collecting the debt Tinkham owed the insurance company, and of which the former was the agent. And the agree-

ment was entered into as the means of paying to Peck the portion of the purchase money coming to him, by getting time. Not having the $10,000 to pay Peck, and he not desiring to become the owner of the property, he was willing to give time to Woodworth within which he might make payment, and then he could look to the property to be reimbursed, and to collect the debt due the insurance company; so that, when he became the purchaser under this arrangement, he virtually paid the purchase money. He, soon after the purchase, gave up the note to Tinkham, and discharged the debt the insurance company held against him. When Woodworth assigned the certificate of purchase to Peck, and became liable to Peck for the amount of his debt, he gave the note he held on Tinkham to him. Woodworth afterward paid Peck, obtained the certificate of purchase, and procured a deed for the premises, under the master's certificate.

From these facts, we can only infer, that Woodworth was the purchaser of the property at the master's sale; that all of the previous negotiations only related the means of paying the purchase money, upon which Peck held a lien. He did not become the purchaser of the decree, so as to control or satisfy it, except by purchasing the mortgaged premises. He had not then become liable to pay any thing on account of the decree, nor was it intended that he should, until the purchase should be made. He only became liable to Peck after the property was struck off at the master's sale. He no doubt agreed to purchase in the name of Peck, but as Peck was not the complainant in the suit, and only held a lien on the mortgage to secure his debt against Tinkham, we do not see that it could have mattered if the purchase had been made in the name of Peck. Neither he nor Woodworth were parties to the record. Nor do we see, that Peck or Woodworth were chargeable with a knowledge of errors in the decree. Woodworth was regarded as the purchaser by all parties, and we do not see that he differs from ordinary purchasers at a judicial sale. Nor can the fact that he commenced negotiations for a lien on this

mortgage before it was foreclosed matter, as it was not consummated until after the decree was rendered.

Even if the purchaser of a decree or judgment at law could be held to notice of irregularities in the decree or judgment, so as to affect his purchase, on a reversal, there seems to be no evidence that Woodworth ever, either in law or equity, was the owner of this decree. He had only negotiated to become the purchaser under the sale on the decree. Had he made an arrangement with Tinkham and Peck to purchase at the sale, and given his note to Peck for the amount of his debt, and surrendered the note he held to Tinkham, no one would have doubted that he was a purchaser of the premises. And we can perceive no material difference. The two cases are similar in principle. In any light in which we can view this case, we do not see that Woodworth occupied the place of a complainant, or even a party to the record; and we understand that the rule can only affect such a party, or one strictly occupying that relation.

The law proceeds upon the ground, that a plaintiff is bound to know whether his judgment or decree is regular, and, if it is not, he becomes a purchaser in its satisfaction, with a full knowledge of the errors it contains. But the rule does not apply to persons not parties to the record. The law does not require a purchaser to inspect the record and to see that it is free from error. He only has to see that the court has jurisdiction, and there is such a judgment or decree unreversed as authorizes the sale. If such was not the rule, no one would become a purchaser at a judicial sale, and all competition would cease, and plaintiffs would become purchasers at their own price. Stability and confidence must be given to judicial sales to the fullest extent compatible with the interests of parties, as well the purchaser as the defendant. We will not presume, that, because a person not a party to the record may have negotiated to pay the purchase money in a particular mode, if he shall become the successful bidder, he has therefore become acquainted with error in the record, under which the sale is made; or even that a purchaser not a party to

the record, having such notice, should have his purchase set aside. A purchaser at a judicial sale, who has paid his money, should not be required to pursue it in the hands of the plaintiffs on the reversal of a judgment. Litigation should not be thus increased. But, when a plaintiff becomes a purchaser, and continues to hold the title at the time his judgment or decree is reversed, he can suffer no wrong or inconvenience by having the sale set aside. He is only placed where he should have been when he recovered his erroneous judgment. It was wrongful, and he should not be permitted to retain its fruits. But the purchaser, not a party to the record, paying his money, stands in a different position.

In this case Woodworth purchased the property, paid his money, and obtained his deed, before the case was removed to the Supreme Court to be reviewed. He did not pay his money while the writ of error was pending, or after the decree was reversed. He seems in all things to have acted in good faith, and to have been a *bona fide* purchaser at the master's sale; and we are clearly of the opinion, that the sale should not be set aside. The court below did not err in dismissing the bill, and the decree must be affirmed.

*Decree affirmed.*